IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Michael Means,

         Plaintiff,

        vs.               Case No. 14-4056-JTM

Arthur Dietrich, et al.,

         Defendants.


MEMORANDUM AND ORDER


Plaintiff Michael Means, a Kansas resident, has brought the present action against five Florida residents, and one resident of South Carolina, based upon his 2007 sale of a herd of lean-beef cattle. After the defendants moved to dismiss Means's claims (which include breach of contract and conversion) for a lack of personal jurisdiction, Means filed an Amended Complaint adding a claim of conspiracy. The defendants have renewed their motions to dismiss (or to transfer the action to Florida). For the reasons providing herein, the court dismisses the claims against defendant Glenn Winburn for lack of personal jurisdiction. The court also finds that Kansas is not a proper venue as to some of Means's claims against the other defendants. Finally, the court finds that the interests of justice strongly support a transfer of the action to the Northern District of Florida pursuant 28

U.S.C. § 1404(a).

*Plaintiff's Allegations*

The Amended Complaint alleges that, in the fall of 2001, after seeing an article about Means's Parthenais herd, Arthur and Charlotte Dietrich traveled to Means's farm in Topeka, Kansas, to buy a Parthenais bull. Dietrich Farms, in Graceville, Florida, has been in the cattle industry for several generations, selling their Limousin cattle to the nationally branded beef company Laura's Lean Beef Company, based in Lexington, Kentucky.

Means offered to sell a Parthenais bull for $3,500 to $4,000. The Dietrichs rejected the offer, and bought an unregistered Parthenais bull from a breeder in Missouri for a lesser price.

During a follow-up visit to the Topeka farm, Arthur Dietrich introduced the plaintiff to his friend George Fisher, who also sold Limousin cattle to Laura's Lean Beef. Means helped Fisher create his own Parthenais herd through an embryo transplant program.

In 2006, Fisher and Means agreed that Fisher would care for and feed some of Means's Kansas-based, Parthenais herd at Fisher's farm in Chipley, Florida, in exchange for the right to buy cattle from this herd on an annual basis. Pursuant to the agreement, Fisher bought cattle at prices ranging from $2,000 to $5,000

In November 2007, Arthur Dietrich, on behalf of Dietrich Farms, offered to buy an 80% interest in Means's Kansas-based, Parthenais herd. Means would keep the remaining 20% interest in each animal from the Kansas-based herd, and in all offspring. Dietrich also

2

offered to lease ten full blood Parthenais bulls from the herd for breeding with Dietrich Farms' Limousin herd. In addition to a lease fee, Means would also receive a 20% interest in the increased usable carcass percentage in each bull's offspring, as it was sold for processing. These proposals were incorporated after further negotiations into a Partnership Production Agreement (PPA).

Under the PPA, Dietrich Farms agreed to pay $125,000 for the 80% interest in 83 heads of Parthenais cattle, and to lease the ten Parthenais bulls. The plaintiff kept a 20% interest in each animal bought, in each animal's offspring, and in the increased usable carcass percentage in each bull's offspring where such offspring were sold for processing. The reduced sale price of the animals was $2,400 per purebred cow, $2,400 per purebred heifer, $3,500 per yearling bull, $2,000 per yearling heifer, $1,000 per bull calf, and $1,000 per heifer calf.

During the six years after the PPA, the cattle were worth approximately $1,745,800. The plaintiff's interest was approximately $349,160. According to the Amended Complaint, the actual value of the cattle has significantly increased due to the positive effects of the Parthenais cattle on the industry.

Means kept full ownership of the ten leased bulls. At his request, Dietrich Farms would return the bulls or replace them with the bulls' full blood offspring. Each of the bulls was worth  $5,000 when delivered to Dietrich.

When crossbred with the Dietrich Limousin cattle, the bulls were expected to yield either a three-quarters blood or purebred Parthenais herd, with an estimated value of

3

$828,750. The industry would have considered this herd "purebred," and the cattle were eligible for registration as such.  As a show of good faith, and because of his retained interest, Means agreed to pay $25,000 for feeding the herd. This amount was credited against the purchase price.

With the help of Fisher, Means began shipping the herd to Dietrich Farms during December, 2007. The shipment continued into the following month.

Arthur Dietrich confirmed that Dietrich Farms would send the first payment to Means by January 1, 2008, and that a second installment for the balance would be sent after all the cattle were delivered. Means spoke with Gordon and Lady Dietrich about the forthcoming $50,000 wire payment to Means's bank account in Topeka, Kansas. Means received this payment from Dietrich Farms a few days later.

Arthur Dietrich asked Means for extra ear tags and copies of registration papers, and Means agreed. According to the Amended Complaint, Means later discovered that Charlotte Dietrich stole the original registration papers, replacing them with copies. Means was forced to spend $1,400 to replace the original registration papers through the Parthenais Cattle Breeders Association of America.

Means refused to transfer registered title on the eighty-three head of cattle or to provide a bill of sale until Dietrich Farms provided the PPA.

In February 2008, Means, Fisher, and the Dietrichs discussed creating an entity to sell Parthenais meat products. During this same time, Michael and his wife Nancy personally delivered the last shipment of Parthenais cattle from their Kansas farm to

4

Dietrich Farms in Florida. Previous shipments had been delivered by Stewart Trucking, Inc., a company located in Westmoreland, Kansas.

Charlotte Dietrich was primarily responsible for cataloguing and preparing the cattle directory for the Parthenais herd, using Means's registration papers as a cross-reference. Michael Means, Nancy Means, and Arthur Dietrich aided Charlotte with this task.

On March 1, 2008, Means learned that his father passed away in Arizona. Before leaving Dietrich Farms for the funeral, Fisher, Arthur Dietrich, and Gordon Dietrich called an emergency meeting to finalize their plans for the new business entity, the American Ultralean Beef Products Company (AULB). The AULB consisted of three members: Gordon Dietrich, George Fisher, and Nancy Means.

Fisher and the Plaintiff wanted Arthur Dietrich to be the third member, but Arthur insisted that Gordon take his place. Lady Dietrich stated that she and Gordon had no interest in the cattle industry, and that Gordon only agreed to be a member in AULB because of Arthur's insistence. Each member agreed to invest $7,000 in AULB.

Means requested, and the members agreed, that neutral accountants and attorneys would create AULB, create forms and bills of sale, monitor AULB's books, and help resolve potential issues between the members.

The Amended Complaint alleges that, while Lady Dietrich agreed to assume the responsibility for retaining these professionals, she never intended to do so. Instead, Gordon and Lady Dietrich hired Ben Armstrong, their personal attorney, and their

5

personal accountants to work for AULB. Means was never able to obtain an accounting of AULB's sales and expenses despite his repeated requests. Fisher agreed to temporarily keep the company's books and to apply for corporate status. However, Lady Dietrich forced Fisher to turn over the books to her.

The AULB members agreed that Means would be responsible for finding customers for the company's products. In return, he would receive a ten percent sales commission on AULB products, a further three percent commission on all AULB products influenced by his patent-pending high-omega formula, and would be reimbursed for his expenses.

Only Means, Fisher, and Gordon Dietrich were to be identified as agents on AULB's business checking account, and the signatures of two agents were necessary to use the account. However, without Means's knowledge, when Lady Dietrich opened the business checking account, she identified herself as an agent, and only one agent's signature was required. Gordon Dietrich never signed the requisite paperwork with AULB's bank to use the account, but he subsequently issued numerous checks on AULB's behalf.

The members agreed that corporate decisions would require the approval of two of the three members. AULB's cattle would be processed by Krehbiel's Specialty Meats, Inc. in McPherson, Kansas. George Fisher filed AULB's Articles of Organization with Florida's Secretary of State on May 13, 2008.

At the same March 1st emergency meeting, Lady Dietrich stated she would send the second installment payment for Means's cattle and would personally draft the PPA. She signed and mailed a check for the second installment payment in March 2008. The check

6

identifies Dietrich Farms as the bank customer. Lady Dietrich included a letter to Means stating:

> Enclosed is the check for the second and final payment for the cattle. The amount of $ 51693.57 represents final payment of $50,000.00; plus ½ of the freight bill; minus $30.00 for wire transfer fees. I hope you find this amount agreeable.

> For future paperwork that we need to handle when you return to Florida, we are working on a contract that states the details of our arrangement concerning the cattle purchase. We need to know what the 20% ownership dollar amount is in case something happens to you.

> We hope that your return to Kansas & Arizona was pleasant. Please accept our condolences on the death of your father.

> See you soon,
> Lady

Means was disheartened by Dietrich Farm's failure to provide a written PPA, but because Dietrich Farms was an established family-owned cattle business, he believed he could continue to monitor his cattle through AULB. The ultimate sale of AULB cattle would occur after successful breeding, which would take between four and six years.

Despite their express agreement, and despite a specific agreement as to the terms of their arrangement and relationship, Dietrich Farms never sent the PPA. Because of this, Means never transferred registered title on the 83 head of cattle to Dietrich Farms, nor did he provide a bill of sale to Dietrich Farms.

Dietrich Farms refused Means's subsequent demands for an accounting of the entire Parthenais herd (the 83 head of cattle sold to Dietrich, the ten leased bulls, and all offspring). Instead, without Means's knowledge, Dietrich Farms sold all of these Parthenais

cattle to Laura's Lean Beef, or used them to breed cattle which were sold to Laura's. Means never received any payments from these sales.

Dietrich Farms also never paid Means for the leased Parthenais bulls, and never returned the bulls. The Amended Complaint alleges upon information and belief that the bulls were sold to other producers. Further, Fisher and Dietrich Farms overshipped Limousin meat for processing with the representation that it was Parthenais meat.

While Means was finding customers for AULB's Parthenais and Parthenais-influenced meat and was caring for his wife, George Fisher and Dietrich Farms were shipping meat to Krehbiel's in McPherson, Kansas for processing.

AULB's principal customer was the Cancer Treatment Center of America in Tulsa, Oklahoma, which purchased the Parthenais meat products for its reputed health benefits.

Without Means's knowledge, Fisher and Dietrich Farms began shipping more meat to Krehbiel's than AULB's customers were ordering. Means demanded they stop excess shipments, which was causing unnecessary expenses to AULB. Because of the excess, Means had to buy a freezer and shelving for installation at Krehbiel's. After the freezer filled, Krehbiel's had ship meat to other locations for storage

In February 2009, Krehbiel's informed Means that AULB had an unpaid processing bill for $44,000, that it would not process any more meat until the bill was paid, and it would begin to sell AULB's stored meat to cover the bill.

AULB refused to pay the bill, so Means had to take out a personal loan to cover the expense. AULB never reimbursed Means for the loan, which Means paid off in 2011.

In addition, Fisher and Dietrich Farms shipped their personal Limousin cattle to Krehbiel's for processing, falsely characterizing them as Parthenais.

After the Cancer Treatment Center of America found it had served Limousin steaks to its guests and residents, it stopped buying Parthenais meat products.

In June 2009, Fisher and Lady Dietrich admitted that they were paying themselves an extra $10,000 per load of cattle shipped to Krehbiel's for processing.

Bills of sale were not created for all of the loads that Fisher and Dietrich Farms sent to Krehbiel's, and Fisher and Dietrich Farms kept the proceeds from some of these sales.

Ultimately, AULB was unable to sell all of the meat shipped to Krehbiel's, since the meat had a two-year shelf life after it was processed.

In May 2009, Means, on behalf of AULB, secured Vendor and Exclusivity Agreements with Health Food Associates, (doing business as AKiN's Natural Food Markets), and Chamberlin Natural Foods, (doing business as Chamberlin's Market and Café). These companies agreed that their grocery stores would carry AULB's meat products for a seven-year period, yielding approximately $3,360,000 in total revenue for AULB. Fisher and Gordon Dietrich approved the AKiN's and Chamberlin's agreements in a June 2009 meeting.

Lady Dietrich separately contacted AkiN's and Chamberlin's, and insisted they only communicate with AULB through her. AKiN's and Chamberlin's immediately contacted Means, asking if there were issues with AULB's management.

In January 2010, AKiN's and Chamberlin's informed AULB that its packaging labels

9

needed to include bar codes for AKiN's & Chamberlin's grocery stores.

The Amended Complaint alleges that Lady Dietrich refused to allow Krehbiel's to charge for placing new labels on AULB's frozen meat packages. Instead, she, Gordon Dietrich, and Fisher traveled to Krehbiel's in Kansas to personally place new labels on the packages.

When AKiN's and Chamberlin's received the frozen meat packages with the new labels, the labels kept falling off the packages. AKiN's and Chamberlin's then refused to carry AULB's products, because the labeling created the impression that AULB was poorly managed.

In April 2011, Gordon Dietrich filed lawsuit No. 67-11-CA-134 against AULB, Fisher, and Means in Washington County, Florida, asserting claims for dissolution of AULB, breach of fiduciary duty, and unjust enrichment. Gordon was represented by Ben Armstrong.

Summonses were issued for Fisher, AULB (through George Fisher), and Fisher's Company, Arrowhead Beef. All three defendants were served with a summons and a copy of the complaint. No summons was issued for Means. Instead, counsel prepared a Notice of Commencement of Action referencing a separate lawsuit (Case No. 67-11-CA-133), and requesting that Means sign the enclosed waiver of service of process. Means never received the Notice of Commencement of Action and he never waived service of process. Gordon Dietrich did not effect service of process on Means.

Means learned of the Washington County lawsuit during a conversation with

10

George Fisher. Fisher told him that he had already spoken to an attorney, Jeff Goodman. Fisher also told Means that Dietrich Farms might be selling Means's Parthenais cattle. Fisher had a pre-existing relationship with Goodman, who had represented Arrowhead Beef in a separate matter.

Means agreed to Goodman's representation of AULB in the Washington County lawsuit, and split the $1,000 retainer fee with Fisher.

Goodman identified a single potential conflict regarding his representation of AULB in the Washington County lawsuit. Because Gordon Dietrich asserted a claim for dissolution of AULB, Goodman believed that there could potentially be a conflict between Means and Fisher with respect to their separate claims for AULB's assets. Goodman did not prepare a written conflict waiver. Goodman did not represent Means in his individual capacity.

Shortly after the Washington County Lawsuit was filed, Goodman and Armstrong sought an audit of AULB. In June 2011, Goodman arranged a meeting at his office with the audit accountants, Fisher, Armstrong, and Gordon Dietrich. Arthur Dietrich also attended the meeting even though he was not a party to the lawsuit. Means participated in the conference by telephone. The meeting solely concerned AULB's history.

While the Washington County lawsuit was pending, and without Means's knowledge, Armstrong provided legal services for AULB pursuant to Gordon and Lady Dietrich's unilateral instructions. Armstrong did not present or secure a written conflict waiver from Means or Fisher.

11

In October, 2012, Gordon Dietrich filed a separate lawsuit (Case No. 12-499-CC) (the "Jackson County Lawsuit") against Fisher in Jackson County, Florida. Gordon asserted claims for money owed and for breach of promissory notes. Attached to the complaint is a check from Dietrich Farms to Fisher, signed by Gordon Dietrich.

Goodman also represented George Fisher in the Jackson County lawsuit, and Fisher asserted a counterclaim for conversion based on Gordon Dietrich's alleged use of AULB property. Fisher did not join AULB or Means as parties to the lawsuit. Goodman did not tell Means of the lawsuit.

According to the Amended Complaint, some of the claims asserted in the Washington and Jackson County Lawsuits were disguised derivative actions — claims which actually belonged to AULB but were asserted personally by Gordon Dietrich or George Fisher.

In late 2012 or early 2013, Fisher and Goodman informed Means that Gordon Dietrich wanted to mediate the Washington County Lawsuit for the purpose of dissolving AULB. They asked Means to attend a March 2013 mediation in Florida as a witness to corroborate Fisher's testimony.

When the mediator asked Means if he had any unresolved issues with AULB, Means stated that the Cancer Treatment Center of America mistakenly sent a $4,800 check to AULB, Lady Dietrich refused to return the check and deposited it, even though she knew AULB was not entitled to the money, and Gordon Dietrich withdrew all of the remaining funds in the AULB account (except for $16 to cover two months of service fees). Means also

asked for an accounting of AULB's books because he believed that there were approximately 106,000 pounds of unaccounted for meat.

Gordon Dietrich agreed to write a $5,000 check (including $200 in interest) to Means for the Cancer Treatment Center of America's mistaken payment and to provide the requested AULB records.

Means now argues that he did not understand the Settlement Agreement to be a universal settlement of all claims among the parties. His Amended Complaint states that no one ever told him of such an intent, and further that the mediator told him afterwards, "Now you can go get your cattle." He also stresses that he did not know at that time that the mediator was not a certified mediator, and had once worked for the Dietrichs.

The Amended Complaint alleges that Gordon Dietrich never provided an accounting of AULB's records, and also that Gordon Dietrich failed to properly dissolve AULB. AULB was administratively dissolved in 2011 because an annual report was not filed with the Florida Secretary of State for the respective reporting year.

Means visited Arthur and Charlotte Dietrich at their farm the day before the March mediation in an attempt to make amends, check on the Parthenais cattle, and follow up on the missing PPA.

Means saw Parthenais cattle during the visit, but he was unable to discern whether the cattle he saw were from his original Parthenais herd. When he asked Arthur Dietrich about the cattle in the original Parthenais herd, Arthur Dietrich told Means that the cattle were sold two years earlier. Arthur Dietrich refused to identify the purchaser.

13

Means subsequently learned that Dietrich Farms sold the cattle to Winburn Farms in April 2012.

Winburn Farms was already in the cattle industry and had a longstanding relationship with Laura's Lean Beef. Laura's representative Tommy Baxley aided several transactions between Dietrich and Winburn Farms involving the Parthenais cattle. Baxley was also the person who first informed Fisher that Dietrich Farms was selling Means's cattle.

Means visited Winburn Farms and found as many as forty to fifty Parthenais cows with tattoos and ear tags showing that they were registered to Means. Means could not locate the ten bulls that were leased to Dietrich Farms. The same forty to fifty cows were present at Winburn Farms at least one year after this initial visit.

Means asked Glenn Winburn about the herd. Glenn Winburn responded that he paid $168,000 for eighty-four Parthenais cattle from Dietrich Farms. Winburn stated that he noticed the tattoos and ear tags on the cattle and concluded that they were likely registered to someone other than Dietrich Farms. He was told the registration papers would be forthcoming from Dietrich Farms.

Winburn admitted that his veterinarian had pointed out the tattoos and ear tags to him when the cattle were initially examined as part of the sale. However, Winburn made no effort to ascertain the true owner of the Parthenais cattle. Means showed copies of his registration papers to Winburn.

Despite learning that the Parthenais herd belonged to Means, Glenn Winburn made

no effort to return the cattle.

Winburn Farms is currently selling Means's Parthenais cattle to Laura's and is breeding the Parthenais cattle with its other cattle. Winburn has not given any proceeds from these sales to Means. Winburn initially agreed but ultimately refused Means's requests to provide information about his Parthenais herd, including records allegedly provided by Dietrich Farms and by Glenn Winburn's veterinarian.

In August 2013, Means made a written demand that Arthur and Charlotte Dietrich compensate him for their unauthorized sale of his Parthenais herd to Winburn Farms. Arthur and Charlotte Dietrich rejected the demand on the grounds that Means had released any claims in the March, 2013 settlement.

**Personal Jurisdiction**

Two defendants, Charlotte Dietrich and Glenn Winburn, argue that the court lacks personal jurisdiction over them. In determining whether the court may exercise jurisdiction over a non-resident defendant in a manner consistent with due process, the court must determine both that (1) the defendant has such minimum contacts with Kansas that they should reasonably anticipate being haled into court in this state, and, if so, (2) whether exercising personal jurisdiction over the defendant would offend traditional notions of fair play and substantial justice. *AST Sports Sci., Inc. v. CLF Distribution Ltd.*, 514 F.3d 1054, 1061 (10th Cir.2008)

Charlotte Dietrich is 83-years-old. According to her affidavit, she has helped with

Dietrich Farms' work from time to time, and has some knowledge of its operations, but has not taken any active role it its operations. She acknowledges accompanying her husband Arthur to Kansas twice, when Arthur viewed the plaintiff's cattle. During these trips, she spoke with the plaintiff. However, she states that conversations about the cattle only involved Arthur and the plaintiff. She states she had no conversation about business with the plaintiff, and played no role in the sale of the cattle herd to Winburn. According to an affidavit by Gordon Dietrich, Dietrich Farms was  a partnership between he and Arthur until 1997, and afterwards was his sole proprietorship.

The plaintiff responds by noting the Complaint's allegations that, like all the Dietrichs, Charlotte had actual and apparent authority with respect to the conduct of Dietrich Farms' business operations. In addition to the two visits to Kansas, which were undertaken for the purpose of furthering the sale of the Kansas-raised cattle, Means specifically alleges that Charlotte was primarily responsible for cataloging and preparing a directory for his herd. He further alleges that she stole the registration papers for the herd. Finally, he notes the allegations in the Amended Complaint that Charlotte participated in the conspiracy among the Dietrich defendants to obtain the Kansas cattle. In furtherance of the conspiracy, the Dietrich defendants allegedly obtained the cattle through false representations, made to Means in Kansas, that a written PPA would be forthcoming. The Dietrichs, together with Fisher, sought to hide the fraud by creating the AULB, getting Means to release his claims, and surreptitiously selling the herd to Winburn.

Given the early stage of the litigation, and the lack of certainty as to Charlotte's

16

actual role in the affairs of Dietrich Farms, Means argues that the resolution of the motion to dismiss for lack of personal jurisdiction is premature. Alternatively, he argues that the allegations are otherwise sufficient to support the determination that the court has personal jurisdiction over Charlotte Dietrich.

The court finds that it cannot resolve the issue of personal jurisdiciton at the present time, given the sharply contrasting allegations relating to Charlotte Dietrich's actions. While Dietrich Farms may have been operated as a sole proprietorship, the plaintiff alleges that the actions of the Dietrich family made it appear that each family member held authority in the business. According to the plaintiff, Charlotte accompanied her husband on a business trip to Kansas, helped catalogue his cattle herd, and participated in the conspiracy to obtain the cattle, including stealing the original registration papers.

The defendants stress that Charlotte "specifically denies and controverts taking the registration papers." (Dkt. 51, at 4). Further, she argues that the supposed theft makes no sense, and that the allegation is pure speculation, since Means "admits he has no personal knowledge that Charlotte took the papers." *Id*.

The latter point relies on a misinterpretation of a passage from the Amended Complaint. "Without my knowledge," Means states in the pleading, "during this visit to Dietrich Farms, Charlotte Dietrich stole the original registration papers." (Dkt. 40-1, ¶ 12). The most reasonable interpretation of this statement is that Means did not know of the theft *immediately*, not that his current allegation of a theft lacks all personal knowledge. The defendant's other arguments relate to the circumstantial credibility of an actual theft. At

17

this stage, the court does not weigh the evidence, and must accept all of the plaintiff's allegations as true. *See FDIC v. Oaklawn Apartments*, 959 F.2d 170, 174 (10th Cir.1992). The court concludes that a decision as to Charlotte Dietrich's motion is premature given the disputed evidence.

Defendant Winburn has a cattle farm in Aynor, South Carolina. He has never been to Kansas, and owns no property here.[1] According to Winburn's affidavit, he bought the herd from Dietrich Farms for the reasonable market price of $154,000. This purchase was the only connection Winburn ever had with any of the Dietrichs.

At the time of the sale, the cattle were not marked, and Winburn had no reason to believe that anyone other than Dietrich Farms had an interest in the cattle. The cattle were shipped from Florida to South Carolina. Some of these cattle were later sold to another purchaser in Indiana. Winburn never met the plaintiff until Means showed up unannounced at his farm in March, 2013 asking questions about the herd.

The plaintiff's allegations against Charlotte Dietrich include allegations that she actively participated in the Dietrichs' efforts to obtain the Kansas-raised cattle from the very beginning of the transaction, and personally appeared in Kansas to further this scheme. In contrast, Winburn is targeted in only two counts of the Amended Complaint, namely the claims for conversion and the new, largely conclusory, claim of conspiracy.

---

[1] In 2006, Winburn employed a third-party trucking company to take 72 of his calves to the Decatur County Feed Yards in Oberlin, Kansas. This transaction as independent of the dispute over Means's cattle, and the plaintiff does not premise his argument for jurisdiction on that isolated event.

However, Means fails to provide any specific factual allegations supporting a determination that Winburn would have been aware that the putative conspiracy would injure Means in Kansas. *See American Land Program, Inc. v. Bonaventura Uitgevers Maatschappij*, 710 F.2d 1449, 1454 (10th Cir. 1983) (dismissing claim premised on conspiracy jurisdiction in absence of prima facie factual showing of conspiracy); *Martin v. Stites*, 31 F.Supp.2d 916, 933 (D. Kan. 1998) (civil conspiracy must supply at least "some specificity").

Here, Winburn directly avers that he purchased the cattle for fair market value and had no knowledge that anyone other than Dietrich Farms owned the cattle. There is no evidence or allegation that Winburn agreed or conspired to injure Means in Kansas.

The conspiracy claim in the Amended Complaint was added only after Winburn's motion challenging personal jurisdiction as to the conversion claim. Now Means asserts merely that, "if Glenn Winburn had contacted the Parthenais Cattle Breeders Association of America .... he would have confirmed my ownership in the cattle." (Dkt. 41-3, ¶ 6). This assertion is expressly rendered only "[u]pon information and belief." The defendant reports that extensive research has failed to demonstrate that such a Breeders Association is a going concern anywhere in the United States, and research by the court confirms this conclusion.

Even if Winburn may have had reason to suspect that another party had an interest in the cattle, there is no factual showing that the sale was itself unlawful. Indeed, Dietrich Farms held an 80% interest in the cattle, and the Amended Complaint does not allege that Dietrich Farms was precluded from selling the cattle, only that if they were sold, Means

was entitled to compensation. There is no factual showing Winburn was actually aware of any Kansas connection to the cattle. *See American Land Program*, 710 F.2d at 1454 (for conspiracy jurisdiction, there must be overt acts in the forum state "of which the out-of-state co-conspirator was or should have been aware") (quoting *Glaros v. Perse*, 628 F.2d 679, 682 (1st Cir. 1980)).

Means's claim against Winburn is purely speculative — again, he alleges what the defendant might have learned "*if* Glen Winburn had contacted" the theoretical Breeders Association. (Emphasis added). Winburn has provided evidence he paid a full and fair price for the herd. There is no factual showing that, under industry practice or otherwise, Winburn was somehow required to trace all potential minority ownership interests in the cattle, or that such a search would have revealed the cattle's origin in Kansas or Means's 20% interest. Conspiracy jurisdiction requires a co-conspirator's "deliberate choice to enter into the conspiracy." *Merriman v. Crompton Corp.*, 282 Kan. 433, 472, 146 P.3d 162 (2006). "[F]or conspiracy jurisdiction to apply, plaintiff must allege 'a conspiracy to commit a business tort which had foreseeable consequences in Kansas.'" *Felix v. American Honda*, No. , 2008 WL 199817, *2 (D. Kan. 2008) (quoting *NL Industr. v. Gulf & W. Industr.* 650 F. Supp 1115, 1137 (D. Kan. 1986) (citation and emphasis in *NL Industr.* omitted);

In *Orion Ethanol v. Evans*, No. 08-1180-JTM 2009 WL 2355275 (*D. Kan. 2009), the court rejected the plaintiff's claim that a sale of ethanol facilities outside Kansas would support a claim of conspiracy jurisdiction based simply on the ultimate effect of the sale to the plaintiff in Kansas. "The court declines to find that a purchase transaction that takes

place in Texas or California of property in Texas or California would have foreseeable consequences sufficient to assert conspiracy jurisdiction." *Orion*, 2009 WL 2355275, at *5. In this action, Means has failed to supply plausible factual allegations showing that Winburn knew or should have known of a Kansas connection to the herd.

The court concludes that the plaintiff has failed to make a plausible factual showing that Winburn, operating from South Carolina, should have reasonably anticipated being haled into court in Kansas based upon his purchase of a cattle herd from Florida. Even assuming that such minimum contacts existed, the court also concludes that it cannot exercise personal jurisdiction over Winburn in a manner consistent with fair play and traditional notions of fair play and substantial justice. In assessing the reasonableness of Kansas jurisdiction, the court considers

> (1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient solution of controversies, and (5) the shared  interest of the several states in furthering fundamental social policies.

*Trujillo v. Williams*, 465 F.3d 1210, 1221 (10th Cir. 2006) (quoting *Pro Axess, Inc. v. Orlux Distribution, Inc.*, 428 F.3d 1270, 1279–80 (10th Cir. 2005)).

The burden on Winburn is substantial, given the complexity of the action and the multitude of claims asserted by Means, few of which directly target Winburn. Means and the Dietrichs have been interacting for well over a decade, and Means advances many claims including racketeering and conspiracy based on that lengthy history. In contrast, Means has supplied no plausible factual allegation of Winburn's involvement in the

dispute before he bought the herd in 2012.

Aside from the eleventh-hour, purely conclusory conspiracy claim now asserted by Means, the only allegation against Winburn is a straightforward claim of conversion. Accordingly, although he had limited involvement in the facts of the case, Winburn faces ensnarement in the highly complex claims now generated by Means's Kansas litigation.

The court finds the interests of Kansas limited. Generally, states have an interest in providing a forum in which their residents can seek redress for injuries caused by out-of-state actors. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 483 (1985). Here, however, while the herd originated in Kansas, by the time of Winburn's purchase, the herd had been in Florida for some four years. Further, as noted earlier, Means kept only a limited 20% interest in the herd. His agreement with Dietrich Farms did not prohibit resale of the cattle, only that he should be compensated by Dietrich Farms in the event of such sale.

Means has failed to show that he could not advance his conversion claim against Winburn expeditiously in either Florida or South Carolina. Further, the evidence as to that claim would center on what Winburn in South Carolina knew or should have known about the Florida herd, and thus be premised on evidence located outside Kansas. Finally, the court finds no basis for believing that the important policies of any state would be adversely affected by trial in Florida or South Carolina of Means's claims against Winburn.

*Venue*

When deciding whether venue is proper, the court must "examine the nature of the

plaintiff's claims and the acts or omissions underlying those claims," and "whether substantial 'events material to those claims occurred' in the forum district." *Employers Mut. Cas. v. Bartile Roofs*, 618 F.3d 1153, 1166 (10th Cir. 2010)(quoting *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 356 (2d Cir. 2005)). "Venue statutes are generally designed for the benefit of defendants, and in determining what events or omissions give rise to a claim the focus is on relevant activities of the defendant, not of the plaintiff." *Goff v. Hackett Stone Co.*, 1999 U.S. App. LEXIS 13351, at *4 (10th Cir. 1999) (citations omitted) (emphasis added).

The Dietrich defendants argue venue does not exist in Kansas as to the claims of fraudulent inducement (Count 5), conversion (Count 6), racketeering (Count 8), breach of fiduciary duty (Count 9), or aiding and abetting such breach (Count 10). In addition, Fisher argues that Kansas is not an appropriate venue as to Means's conspiracy claim (Count 7).

The court grants Fisher's motion as to the conspiracy claim. Fisher argues that the alleged acts in furtherance of the conspiracy "allegedly or necessarily occurred in Florida." (Dkt. 39, at 6) Means responds by stressing that Count 7 incorporates the allegations made throughout the rest of the lengthy Amended Complaint, and then recites a list of various misdeeds allegedly perpetrated by Fisher. (Dkt. 50, at 4-5). Notably, however, almost all of these supposed acts in furtherance of the conspiracy occurred *after* the Parthenais herd was in Florida. Thus, they relate to actions Fisher may have taken while he was in that state.

Of course, the conspiracy asserted by Means is very broad, and includes the allegation that the defendants never intended to pay him for the herd, that the bargain was

23

corrupt from the start. Such allegations may explain why the Dietrich defendants have not argued that venue does not exist as to Count 7. But *as to defendant Fisher* the allegations are quite limited. Specifically, of the list of some 20 events cited by Means as demonstrating Fisher's part in the conspiracy, only four occurred in conjunction with the original acquisition of the cattle. Of these, three are simply background information indicating Fisher's status in the industry, his interest in lean beef, and that he had been introduced to Means.

The remaining allegation (Dkt. 28, ¶ 39) cited by the plaintiff in his Response is that in 2007, "Means, with the help of George Fisher, began shipping the Kansas-based, Parthenais herd to Dietrich Farms." But the plaintiff makes no allegation that Fisher traveled to Kansas and personally assisted in the shipping. The plaintiff makes no allegation, in either the Amended Complaint or in his Response to Fisher's motion, that Fisher acted in Kansas in transferring the cattle. The court finds that, as to Fisher, Kansas is not a proper venue as to the claim of conspiracy.

The court further finds that venue does not exist in the claims identified in the Dietrichs' motion. Under 18 U.S.C. § 1965(a), a RICO claim may be brought against the defendant in "the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(a). "[A] person transacts his affairs within a particular district when he regularly conducts business of a substantial and continuous character within that district." *Miller Brewing Company v. Landau*, 616 F.Supp. 1285, 1288 (E.D. Wis. 1985). *See also Hodgdon v. Needham-Skyles Oil*

*Company*, 556 F.Supp. 75 (D.C.D.C. 1982). This provision supplements the general venue statute. *See Settle v. North*, No. 04-2129-CM, 2006 WL 2540334, *2 (D. Kan. 2006) (citing cases).

Means's response as to the basis for his RICO claim is purely conclusory, stressing his allegation of "predicate acts of ... mail and wire fraud, money laundering, transportation of stolen goods, and sale or receipt of stolen goods," and that the conduct "arises from and relates to ... misconduct in Kansas." (Dkt. 40, at 23-24). However, the specific events cited as overt acts in the Amended Complaint (Dkt. 28, ¶¶ 186-190) involve events which are either limited in number or appear to involve actions occurring outside of Kansas. For example, Means alleges that Dietrich farms engaged in the "receipt of stolen goods" (that is, taking possession of the cattle herd in Florida), and continues to transport stolen goods by selling them "from Florida to South Carolina." (¶ 188, 189).

The electronic communications allegedly sent by defendants into Kansas may be sufficient to create minimum contacts to justify the maintenance of personal jurisdiction over them. But this is a separate question from whether the defendants may be said to *regularly* "transact ... business" in Kansas for purposes of the RICO venue statute. *See Shuman v. Computer Assocs. Int'l.*, 762 F.Supp. 114, 116 (E.D.Pa. 1991) (person transacts his affairs within a particular district "when he regularly conducts business of a substantial and continuous nature within that district").

The court finds venue is not appropriate in Kansas. In *Eastman v. Initial Investments*, 827 F.Supp. 336, 338 (E.D. Pa. 1993), the court concluded that Pennsylvania was not an

appropriate venue for the plaintiff's RICO claims, notwithstanding evidence that the plaintiff had received the defendants' letters and telephone calls there, as well as evidence that the defendants had briefly visited the state. In *Dody v. Brown*, 659 F.Supp. 541, 545 (W.D. Mo. 1987), the court rejected a similar claim of venue under the RICO statute. The court observed:

> Plaintiffs argue that defendants transacted business of a substantial and continuous nature within this district by claiming that defendants exchanged numerous phone calls with plaintiff in this district, the agreement at issue was executed in this district, payment was effectuated in Missouri by means of a wire transfer to defendants in Florida, and the effects of defendants' alleged fraud were felt here. Plaintiffs acknowledge, however, that other than the acts which give rise to this cause of action, defendants have not transacted any other business within the Western District of Missouri. Thus, the issue to be decided is whether these acts alone are sufficient, in and of themselves, to constitute regular, substantial and continuous business activity within this district. The Court concludes that it does not.
>
> Plaintiffs have cited no cases which stand for the proposition that making a few telephone calls from outside the district to a person within the district constitutes transaction of any business within this district, let alone business of a regular, substantial and continuous nature. It is clear that none of the defendants are residents or incorporated in Missouri, have no agents or offices in Missouri, and have no property, real or personal, in Missouri. Nor do plaintiffs contend that defendants ever conducted any business in Missouri other than the transaction in question.

*See also Fernando v. Fernando*, No. 09-1390, 2010 WL 3119729, *10 (E.D.N.Y. 2010) ("[o]ccasional acts such as telephoning or mailing letters into a state are not sufficient to constitute 'transacting affairs' under 18 U.S.C. § 1965(a)") (citing *Daly v. Castro Llanes*, 30 F.Supp.2d 407, 412-13 (S.D.N.Y. 1998), and *Now Plastics v. HP Plastics*, No. 89–6938, 1990 WL 301521, at *3 (S.D.N.Y. 1990).

Venue is similarly lacking as the fiduciary duty claims. The Amended Complaint alleges with respect to these claims:

> 186. Dietrich Farms engaged in mail and wire fraud by using the United States Postal Service and interstate wires to obtain Means's money and property, including even the purported release of his claims against them, by false pretenses, fraudulent schemes, misrepresentations, and promises they never intended to keep, and in fact, did not keep.
>
> 187. Dietrich Farms engaged in money laundering by depositing, withdrawing, transferring, and/or exchanging, Means's knowingly converted and fraudulently obtained property worth more than $10,000.00. At a minimum, this is evidenced by the sale of Means's Parthenais herd to Glenn Winburn without Means's knowledge or consent and by their purposeful retention of all proceeds generated by this sale.
>
> 188. Dietrich Farms engaged in the transportation of stolen goods when they transported or induced transportation of Means's knowingly converted and fraudulently obtained Parthenais cattle from Kansas to Florida and from Florida to South Carolina.
>
> 189. Dietrich Farms engaged in the sale or receipt of stolen goods when they received Means's Parthenais cattle from Kansas and when they sold Means's knowingly converted and fraudulently obtained Parthenais cattle to Winburn Farms.

(Dkt. 28, at 33). However, all these actions occurred in Florida. The herd was received in Florida, kept in Florida, and sold from Florida.

The court finds that venue in Kansas is inappropriate as to Counts 9 and 10, which allege that the Dietrichs and Fisher violated fiduciary duties, or aided and abetted the violation of such duties, with respect to the management of AULB. But AULB is a Florida company, and all of the events underlying these claims relate to actions which the defendants allegedly undertook in Florida. In his Response to the motion to dismiss, Means

27

argues that the defendants also violated fiduciary duties by overshipping cattle (to Kansas) for processing. (Dkt. 40, at 24). But the actual allegations relating to breach of duty in the Amended Complaint mention no such overshipment. Rather, the Amended Complaint (¶¶ 194, 195) states that the defendants violated their statutory duty under Florida law "by failing to account and hold as a trustee any property, profit, or benefit derived from AULB property and by dealing with AULB as or on behalf of a party having an adverse interest to AULB."

This is equally true as to Count 5, in which Means alleges that Gordon Dietrich and Fisher fraudulently induced him to enter into the March 2013 settlement agreement. This agreement was entered into in Florida for the purpose of resolving state litigation in Florida. In his Response, Means argues that he attended the Florida negotiations after learning of them during a telephone call from Fisher, in which Means spoke from Kansas. The Amended Complaint itself, however, makes no allegation of any misrepresentation during that initial telephone call. Rather, the Amended Complaint simply states that the defendants "made false representations regarding, at a minimum, the purpose of the March 2013 mediation, the scope of the Settlement Agreement, and the consideration to be provided under the Settlement Agreement." (Dkt. 28, ¶ 161).

Count 6 alleges that the Dietrichs (and Winburn) converted his interest in the cattle herd when Winburn bought the cattle in 2013. However, at the time of the alleged conversion the herd was located in Florida, and had been in that state for four years. All of the events underlying the claim occurred in Florida, not Kansas.

Means argues that even if the court concludes no venue exists as to any of the claims advanced in the Amended Complaint, it should nonetheless maintain the action, on the grounds that all of the defendants' conduct is connected to the general conspiracy to deprive him of his interest in the Parthenais cattle. In addition, Means notes this court's recognition in *Wichita Federal Sav. & Loan Ass'n v. Landmark Group, Inc.*, 674 F.Supp. 321, 329 (D. Kan. 1987) that "some courts decline to strictly apply the rule that venue must be proper as to each claim where the claims amount to one cause of action with separate grounds for relief," and that accordingly, "proper venue as to the principal claim will support adjudication on all claims." In that case, the court concluded that Kansas was a proper venue for plaintiff's RICO claim, since that claim arose out of "the same set of operative facts" as the other claims of the plaintiff, specifically the defendant's "fraudulent handling of the defendant's account." *Id.* at 330.

In the present case, the court finds such pendent venue would be inapplicable. "The decision whether to exercise pendent venue is a matter of judicial discretion based upon the relatedness of the claims, judicial economy, convenience, and fairness." *Jackson v. MCI Telecommunications Corp.*, No. 92-2053-GTV, 1993 WL 408332, *2 (D. Kan. 1993) (citing 1A Moore, FEDERAL PRACTICE, § 0.342[4]). The core of Means's allegations is that the Dietrichs failed to live up to their obligations as to the Parthenais herd he sold to them from Kansas. The breach of fiduciary duties claims in Counts 9 and 10, explicitly founded on a violation of *Florida* statutory duties, relates to a separate set of operative facts, namely, how the defendants allegedly violated those duties through their conduct of AULB business.

Papering over these differences by conclusory allegations of a conspiracy which asserts nothing more than that the defendants are bad people fails to provide a sufficient basis for venue in Kansas.

As to Counts 5, 6, 9, and 10, the general rule recognized in *Wichita Federal Savings* controls, not the exception relied upon by Means. That is, "where multiple causes of action are asserted ... venue must be proper as to each one." 674 F.Supp. at 327 (citing *Payne v. Marketing Showcase,* 602 F.Supp. 656 (N.D. Ill.1985); 15 Wright, Miller & Cooper, FEDERAL PRACTICE & PROCEDURE § 3808 at 80 (1986)).

Nor do Means's allegations of conspiracy support venue for these claims in Kansas. Notwithstanding the threadbare and conclusory nature of these claims, the effect or purpose of the supposed conspiracy as to each of these claims is markedly different. Part of the conspiracy, and tied to the plaintiff's various contract claims, relates to acquiring the cattle in 2008. (Dkt. 28, ¶¶ 176, 177(a)-(e)).  Otherwise, the alleged conspiracy relates to discrete events or purposes, such as the 2013 sale of the cattle to Winburn (¶ 177(f)), or fraudulent inducement as to the 2013 Settlement Agreement (¶ 177(g), (h)).

In *Wichita Federal Savings*, the defendant broker allegedly mishandled the plaintiff's securities investments (the basis for his Securities Act claim) and his investments in futures commodities (the basis for his RICO and Commodity Exchange Act claims) through a pattern of conduct which was essentially the same (misrepresentation as to market conditions, ignoring plaintiff's instructions, and otherwise misdealing), occurring at essentially the same time (in February and March, 1985). Here, Means alleges essentially

different types of conduct (not following through on the terms of the original sale of the cattle, fraudulent inducement in the Settlement Agreement, and the subsequent sale of the cattle to Winburn) separated by some four years. While Means repeatedly argues that venue for all claims is proper because each is "interrelated with [his] conspiracy claim," (Dkt. 40, at 2, 20, 22, 24, 34), he supplies no authority for the proposition that the existence of such broad-brush conspiracy allegations would permit the court to simply disregard the general requirement for proper venue for each of his claims.

*Transfer*

The decision to transfer an action under § 1404(a) is committed to the discretion of the court. *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1516 (10th Cir. 1991). Generally, the plaintiff's choice of forum is accorded great weight. *Scheidt v. Klein*, 956 F.2d 963, 965 (10th Cir. 1992). In exercising its discretion, the court considers:

> the plaintiff's choice of forum, the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses; the cost of making the necessary proof; questions as to the enforceability of a judgment if one is obtained; relative advantages and obstacles to a fair trial; difficulties that may arise from congested dockets; the possibility of the existence of questions arising in the area of conflict of laws; the advantage of having a local court determine questions of local law; and, all other considerations of a practical nature that make a trial easy, expeditious and economical.

*Chysler Credit*, 928 F.2d at 1516 (quoting *Texas Gulf Sulphur Co. v. Ritter*, 371 F.2d 145, 147 (10th Cir.1967)).

The In support of a transfer, the defendants argue that the central nexus of the present

action is their conduct with respect to the cattle herd once it was in Florida. Means's Kansas interest, they contend, arises solely from the fact that he was allegedly injured here. They argue that most of the witnesses are located in or near Northern Florida, and that an effective judgment against all the parties cannot be rendered in Kansas. Evidence also indicates that defendant Arthur Dietrich is elderly and physically unable to travel to Kansas. The defendants have also submitted evidence indicating that cases in the Northern District of Florida proceed to trial much more quickly than in Kansas (15.1 months compared to 26.6 months).

In support of maintaining the action in Kansas, Means relies overwhelmingly on his "decision to bring this lawsuit in the District of Kansas." (Dkt. 40, at 26). He stresses events such as the telephone calls the defendants made to Kansas, their over-shipping AULB cattle to Kansas for processing, and making payments into Kansas. He responds to the health statement of Arthur Dietrich by stating that he also suffers from "health issues." (*Id.* at 30). And he asserts that "the majority of the records and witnesses material to this lawsuit are located" in Kansas. (*Id.* at 27).

The court finds this last statement, premised on Means's own affidavit, inaccurate. First, while the affidavit lists 26 potential witnesses located outside of Florida, 11 of the witnesses are also located outside of Kansas. Second, Means generates such a lengthy list of Kansas witnesses only by citing generic corporate representatives for various feedlots or meat processors. The testimony of many of the cited witnesses as to how or when they processed certain meat shipments is likely to be completely uncontroversial. For each such

32

witness, the defendants could identify a similar number of witnesses from Florida who would testify to similarly peripheral and uncontroversial matters. More importantly, in considering the availability of potential witnesses, the court considers witnesses likely to supply material testimony at trial. *See Employers Mut.*, 618 F.3d at 1169 (citing 17 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE § 111.13[f][v] (3d ed. 2010) ("The materiality of the prospective witnesses testimony, and not merely the number of prospective witnesses, will determine the extent to which their convenience will be weighed." (citation omitted))). *See also* C. Wright & A. Miller, 15 FED. PRAC. & PROC. § 3851 at 282 ("the focus on this point is qualitative, not quantitative").

In contrast to the defendants – who have articulated both the materiality of the testimony of each prospective non-Kansas witness, and have demonstrated the substantial expense these witnesses would incur for trial here — Means has done neither as to the cited local witnesses. Further, Means has failed to demonstrate that any non-Florida witness with material testimony has expressed an unwillingness to travel to Florida.

The defendants have identified seven important non-party witnesses, including attorneys and accountants, who have indicated that they are unwilling to travel to Kansas for trial.[2] While the testimony of such witnesses could be supplied by deposition, this is

---

[2] These witnesses include Jeff Goodman (AULB's attorney), Tommy Baxley (of Meyer Natural Foods, who brokered the sale of the cattle to Winburn), Sara Applewhite (the accountant who audited AULB), and Matthew Fuqua (the mediator in the Florida Settlement). Means does not mention Fuqua or Applewhite in the text of his Response to the Motion to Transfer. Consistent with the mercurial nature of his claims, and suggesting yet another modification to his complaint, Means stresses that he "reserves the right to join Mr. Baxley as a Defendant and co-conspirator." (Dkt. 40, at 28 n. 2).

an unsatisfactory substitute for live testimony in the present case. Given the plaintiff's broad allegations of deception, fraud, and collusion, the importance of live testimony from such non-party witnesses may be decisive in resolving issues relating to the actions, credibility and motives of the parties. *See* C. Wright & A. Miller, 15 FED. PRAC. & PROC. § 3851 at 271-275 (given the importance of live testimony, "the fact that important nonparty witnesses may be within the subpoena power of one court but not the other is a significant issue").

In responding to the defendants' motion, Means states that many of the witnesses cited by the defendants "appear to be either agents or former agents of the Dietrichs and AULB," and thus their location should "be given little weight in the Court's analysis." (Dkt. 40, at 27-28). Means cites no authority for the proposition that the court should ignore the existence of numerous Florida witnesses simply because they might be "agents or former agents" of another party. Certain such a relationship might affect the weight to be given such testimony by the trier of fact, but it does not warrant ignoring the location of such witnesses, who after all are people too, in determining the best place for trial.

Means supports his claim of illness through his affidavit, which states that he has "serious health issues" and that he was in the hospital for "an extended stay" in September, 2014. The court must note that on this point — unlike the remainder of his affidavit or his

---

Means refers to Goodman as "Means's purported former attorney" and speculates darkly that "it is beyond curious why Mr. Goodman communicated with Gordon Dietrich about Mr. Goodman's availability." *Id*. The court finds no difficulty in concluding that defense counsel has accurately conveyed Goodman's position.

Amended Complaint — Means provides no detail at all as to the nature of his "issues" or the cause of his hospitalization. In ordinary life, his health concerns are his own. But Means filed this lawsuit in Kansas, and is fighting to keep it here, based in part on his health. In addition to the lack of specificity as to the plaintiff's health issues, the court notes with more than passing interest that these issues did not preclude Means from traveling to Florida to visit Dietrich Farms in 2013, attend the Florida mediation during the same year, and, in his quest to locate the missing herd, visit Winburn Farms in South Carolina.

The court finds that the plaintiff's conclusory assertions do not outweigh the evidence supplied by the defendants. That evidence, including an affidavit from a physician, indicates that the 85-year-old Arthur Dietrich suffers from multiple, specific illnesses, and that accordingly he cannot travel over any significant distance.

The parties disagree about whether Kansas or Florida law will govern the plaintiff's claims. Defendants argue that Florida law will govern the claims for promissory estoppel, unjust enrichment, fraudulent inducement, conspiracy, and tortious interference. (Dkt. 37, at 30). Means argues that Kansas law will govern his claims for breach of contract or quasi contract, conversion, and conspiracy. He contends Kansas law controls because "the subject agreements were negotiated, accepted, and performed in Kansas." (Dkt. 40, at 17-18). This factor is not decisive given the sharp disagreement as to where the parties' negotiations and agreements indeed occurred.

The court does note that, with respect to the 2013 Settlement Agreement, the facts directly before the court indicate that the agreement was essentially negotiated, and

ultimately concluded, in Florida. The settlement addressed ongoing Florida litigation relating to AULB, a Florida company. Accordingly, the claims associated with the Settlement Agreement will likely be controlled by Florida law. Further, as noted elsewhere in this Order, the plaintiff's breach of fiduciary duty claims are tied explicitly to a violation of the defendants' duties under Florida statutes.

The court further finds that resolution of the action in the Northern District of Florida will be most likely to result in the effective resolution of the existing claims among the parties. As noted earlier, the court finds that no personal jurisdiction exists in Kansas as to Winburn, and the claims against him are dismissed. And, while the court has denied Charlotte Dietrich's motion requesting the same result, it has done so only provisionally. In the event her version of events, and her lack of any real role in the business operations of Dietrich Farms, proves to be correct, she would dismissed from the action. In contrast, all of the existing defendants would be subject to personal jurisdiction in the Northern District of Florida.[3]

In sum, the core of the present case involves the statements, and intentions, of Means, the Dietrich Family, and Fisher during their lengthy negotiations, meetings, and consultations. Other than the early two visits to Kansas by Arthur and Charlotte Dietrich, the majority of the relevant events occurred in Florida. AULB was a Florida company. The 2013 settlement and associated negotiations occurred in Florida. The attorney and

---

[3] Having agreed to purchase the Parthenais herd from Dietrich Farms in Florida, Winburn would have little grounds for contesting jurisdiction in that state.

accountants accused of double-dealing by Means reside in Florida.

The payments sent to Kansas by the defendants may be relevant to the court's exercise of personal jurisdiction over the Dietrichs, but they are not in and of themselves the basis for Means's claim. Rather, the essence of Means's complaint is that he was not paid more. Similarly, the telephone calls to Kansas cited by Means appear to have been the precursor to negotiations, not the actual negotiations themselves. At least, the carefully constructed pleadings submitted by the plaintiff do not allege that such negotiations all occurred while he was located in Kansas.[4]

Similarly, the Amended Complaint does allege that AULB shipped more cattle to Kansas for processing than the market could bear. But this allegation is relevant to and underlies the plaintiff's breach of fiduciary duty claims, which simply allege that the defendants "fail[ed] to account [from the] profit" derived from AULB property. (Dkt. 28, ¶ 195). That is, that the defendants, in Florida, failed to pay him according the Florida agreement under which the Florida company was created. And, in so doing, the defendants violated their fiduciary duty, which is defined "[under] Chapter 608 of Florida Statutes Annotated." *Id*. at 194.

Even allowing for the plaintiff's choice of forum, the court finds that the other relevant interests strongly support resolution of the action in Florida. This matter is more

---

[4] In his affidavit, Means states that he "occasionally discussed the [AULB] lawsuit in 2012 with Goodman and Fisher, and that "[s]*ome* of these phone calls were made to me in Kansas." (Dkt. 40-1, ¶ 22) (emphasis added). The mediation, and the Settlement Agreement resolving the lawsuit, actually occurred in Florida. Means traveled to Dietrich Farms in Florida before attending the mediation.

effectively tried in Florida, where all parties are subject to jurisdiction and venue exists for all of the claims asserted by the plaintiff.

IT IS ACCORDINGLY ORDERED this 9th day of March, 2015, that defendant Winburn's Motion to Dismiss (Dkt. 33) is granted; the Dietrich defendants' Motion to Dismiss or Transfer (Dkt. 36) is denied without prejudice as to Charlotte Dietrich's Motion to Dismiss, but granted as to the defendants' Motion to Transfer; defendant Fisher's Motion to Dismiss or Transfer (Dkt. 38) is granted as to the requested transfer and otherwise denied as moot; the earlier and superseded Motions to Dismiss (Dkts. 21, 23) are denied as moot, as are the subsequent Motions for More Definite Statement (Dkts. 42, 46).


 s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE